Filed 7/17/24  In re J.P. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B332922 (Super. Ct. No. 2018022666) (Ventura County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.P.,<br><br>    Defendant and Appellant. | |

    In a petition filed under Welfare & Institutions Code section 602[1], J.P. was charged with murder (Pen. Code, § 187) and the enhancement allegation that he personally used a firearm.  (Pen. Code, § 12022.53, subd. (d).)  He was 17 years old

---

    [1] All statutory references are to the Welfare & Institutions Code, unless otherwise stated.

at the time of the alleged offense.  After a hearing, the juvenile court ordered appellant transferred to the superior court.  (§ 707, subd. (a).)  Appellant contends the order is not supported by substantial evidence.  We affirm.

*Facts of the Offense*

On July 1, 2018, an acquaintance hosted a 17th birthday party for appellant at a hotel in Oxnard.  Among the guests were Hector Solarez, appellant's 15-year-old girlfriend, C.E., her 19-year-old sister, G.E., and G.E.'s boyfriend, Edwin Zavala.  The party guests listened to music and drank alcohol.  An argument erupted around 10:00 p.m. after G.E. told everyone to quiet down.  Solarez brandished a gun and challenged Zavala to a fight.  Appellant took the gun from Solarez.  G.E. told Solarez to leave and he did.  Both Edwin and appellant also left.

G.E. invited some other friends, including the victim, Donald Reyes, to the hotel room.  Appellant and Solarez, who both seemed to be intoxicated, returned to the room around 3:00 a.m.  Solarez insisted on retrieving a bottle of alcohol he had brought to the party.  G.E. offered to get it for him.

In the meantime, Solarez and Donald Reyes got into an argument.  G.E. intervened, trying to prevent a fight.  Appellant was standing behind G.E.  He pulled the gun out of his waistband, reached around G.E. and fired at Reyes three times, killing him.  He then fled the scene with Solarez.

Following his arrest, appellant initially denied any involvement in the shooting.  He eventually stated that he fired the gun in self-defense because he saw the victim reaching for something.  Appellant admitted that he disposed of the gun by burying it near some railroad tracks and that he washed the clothing he had been wearing that night.

2

*Facts at Transfer Hearing*

Appellant's first transfer hearing, in September 2018, resulted in an order transferring him to criminal court. The parties stipulated that the juvenile case would be reinstated and the transfer hearing reset in the juvenile court. That hearing was held in March 2021 and again resulted in an order transferring the case to criminal court. We denied appellant's petition for extraordinary writ. (*J.P. v. Superior Court*, B312478, rev. den. Oct. 27, 2021, S271044.)

Effective January 1, 2023, the Legislature amended the legal standard for transfer proceedings, raising the burden of proof and clarifying the factors the court is required to consider in deciding a transfer petition. (Stats. 2022, ch. 330, § 1.) The superior court stayed proceedings and remanded the matter to the juvenile court for a third transfer hearing conducted under the new standard. This appeal follows the juvenile court's third determination that appellant was not amenable to rehabilitation while under juvenile court jurisdiction and that the matter should be transferred to the superior court.

*Appellant's Family Circumstances and Social History*

The third transfer hearing included evidence of appellant's family circumstances, social history and cognitive development. Appellant was repeatedly physically and emotionally abused by his step-father. His mother testified she was not able to protect appellant from her husband because she was afraid he would inform immigration of her legal status and that he might harm appellant even more.

The family moved frequently, leading appellant to attend three different elementary schools. He was diagnosed with a learning disability and had an individual education plan

(IEP).  Appellant attended Oxnard High School but was three years behind his grade level.  His IQ is estimated to be between 71 and 80.  He has been diagnosed with Other Specified Trauma-Related Disorder, Cannabis Use Disorder, Alcohol Use Disorder, and borderline intellectual functioning.

The family's last move brought them to a neighborhood with frequent shootings.  Around the same time, appellant became friends with Solarez who was four years his senior.  Appellant's mother believed that Solarez had a negative effect on appellant's behavior.  His grades got worse and he became more rebellious at home.

*Appellant's Conduct in Custody*

Within the first three weeks after his detention in the juvenile facility, appellant received three write-ups for fighting, one of which he was alleged to have started.  He was also disciplined for three minor infractions.  While in custody, appellant graduated from high school and participated in individual therapy and four rehabilitative programs.  He was also chosen to work in the laundry and the canteen.

Authorities transferred appellant to adult jail on his 18th birthday.  In the first 16 months of his incarceration, appellant received 9 disciplinary write-ups for fighting, possession of contraband, tampering with a security device and receiving tattoos.  Over the next four months, appellant accrued 13 major incident reports.  Two of these involved battery on other inmates.  Two others involved the manufacture and consumption of jail-made alcohol.

*Expert Testimony*

Dr. Blake Carmichael, a clinical psychologist at UC Davis Children's Hospital, was retained by the prosecution and

4

opined that appellant was not fit for treatment under juvenile jurisdiction. He concluded appellant should be transferred to criminal court based on the severity of the offense, the criminal sophistication he exhibited and the likelihood that he would not be rehabilitated before expiration of the juvenile court's jurisdiction.

In evaluating the degree of criminal sophistication exhibited by appellant, Carmichael noted in his written report that the shooting itself appeared not to have been planned. However, appellant possessed the gun for several hours beforehand, providing him time to consider whether he needed to have it or use it. Appellant demonstrated some sophistication when he disposed of the gun soon after the shooting and washed the clothes he had been wearing. He and Solarez appeared to have coordinated a story about the shooting to deceive law enforcement.

In evaluating the likelihood that appellant would be rehabilitated before the expiration of juvenile jurisdiction, Carmichael opined there was not enough time left for rehabilitation given appellant's age. Personal factors including appellant's cognitive abilities, lack of self-awareness, history of chronic abuse and trauma, absence of family support indicated he was less likely to be rehabilitated. Carmichael noted that appellant only succeeded at school when he was in custody, indicating that he needed an "external locus of control" to change his behavior. "Relying on external or situational factors, rather than adopting a genuine desire/motivation to change, detracts from an amenability or investment in rehabilitation." Appellant's conduct in custody, including the incident reports and his tattoos, indicated that he was becoming more entrenched in a gang

5

lifestyle. This also weighed against rehabilitation and in favor of transfer to criminal court.

Deputy Probation Officer Danielle Matsuda testified that the probation department evaluated appellant in 2018 and again in 2023. On each occasion, the department recommended that appellant be transferred to criminal court based on the seriousness of the offense and the degree of criminal sophistication appellant demonstrated. Officer Matsuda acknowledged, however, that it was possible appellant could rehabilitate. The department's report noted that his behavior in custody had been mostly compliant, that he had performed satisfactorily in high school before his detention, and that his family was willing to help him rehabilitate.

Dolores Barnett is the supervisor of programming at the county's Secured Youth Treatment Facility (SYTF). She testified that, in addition to high school and a college program, all youth at the SYTF have access to evidence-based "mental health services . . . substance abuse, health classes, relationship programming, domestic violence prevention programming . . . and . . . reentry programs . . . ." The facility also has programming specifically directed toward gang-involved youth.

Dr. Rahn Minagawa, a clinical psychologist retained by the defense, testified about adolescent psychology, substance abuse, gang involvement and the developmental aspects of trauma. He recommended against transfer to criminal court because he opined appellant was amenable to rehabilitation. The defense also retained Dr. Elizabeth Cauffman, a developmental psychologist. She testified about adolescent development and criminal recidivism, noting that, "over time what we see is most

6

youth desist from criminal behavior," by the time they reach age 25. She also acknowledged that some youth continue offending.

*The Juvenile Court's Order*

The juvenile court found the prosecution had carried its burden to prove by clear and convincing evidence that appellant is not amenable to rehabilitation while under the jurisdiction of the juvenile court. It found that some of the section 707 factors weighed against transfer to criminal court, including appellant's minimal prior delinquent history and the success of previous attempts at rehabilitation. The criminal sophistication factor also weighed against transfer because the offense was not "terribly sophisticated," and "wasn't planned in advance." Appellant did not "wait in hiding" or commit the crime in a "covert manner. He didn't bring the weapon to the hotel room."

The remaining two factors were the "most heavily weighed factors in the Court's position." First, the court found the circumstances and gravity of the offense weighed in favor of transfer. The court emphasized that appellant "was the actual shooter. He was not a get-away driver; he was not someone who took [part] in the conspiracy. He was the actual shooter. The argument which led to the shooting was relatively minor. He was not the main person involved in the verbal argument; he stepped in before the shots were fired."

Finally, the court concluded appellant was not likely to rehabilitate before juvenile jurisdiction expires. The juvenile court acknowledged that the probation department believed it was possible to rehabilitate appellant and that appellant had shown potential for growth by graduating from high school,

7

working with canines and working as a laundry person and in the canteen.

The juvenile court concluded, however, that appellant had regressed while in adult custody. His inability to "at least abstain from engaging in a battery while this matter was pending," in the juvenile court's view, was "not consistent with someone his age with the trajectory that in plus or minus three years, he's going to be rehabilitated." His behavior in custody was not, in the court's judgment, consistent with growth and better decision making. The court also noted that appellant had affiliated with a gang while in jail, engaged in fights and possessed a weapon. The juvenile court concluded this factor favored transfer to adult court because, "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."

*Contentions*

Appellant contends the juvenile court's finding that he is not amenable to rehabilitation was not supported by substantial evidence. He further contends the juvenile court did not properly apply the amenability criterion in ordering his transferred to the criminal court.

*Standard of Review*

We review the juvenile court's determination to transfer a minor to criminal court for abuse of discretion. (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 714 (*J.N.*).) "The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. [Citation.] A decision based on insufficient evidence or the court's "'erroneous understanding of applicable law'" is subject to reversal." (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 187 (*Kevin P.*).)

8

*Discussion*

The ultimate question in a transfer petition is whether a minor is amenable to rehabilitation before the juvenile court's jurisdiction expires. (§ 707, subd. (a)(3); *In re E.P.* (2023) 89 Cal.App.5th 409, 416.) To order a minor's transfer to superior court, the juvenile court must find, by clear and convincing evidence, that the minor is not amenable to rehabilitation prior to expiration of the juvenile court's jurisdiction. (§ 707, subd. (a)(3).) In making that determination, the juvenile court must consider five specific factors: "(A)(i) [t]he degree of criminal sophistication exhibited by the minor. . . . (B)(i) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. (ii) When evaluating the criterion specified in clause (i), the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature. (C)(i) The minor's previous delinquent history. . . . (D)(i) Success of previous attempts by the juvenile court to rehabilitate the minor. . . . (E)(i) The circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (*Ibid*.) The court is required to "recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid.*)

The prosecution bears the burden to produce evidence of the rehabilitation programs available to the minor and whether sufficient time remains in the juvenile court's jurisdiction for the minor to be rehabilitated. (*J.N., supra,* 23 Cal.App.5th at p. 721.) "Given the Legislature's refocusing on minors' amenability to rehabilitation, expert testimony will likely

9

be necessary for a complete analysis. . . . 'Since the dispositive question is the minor's amenability to treatment through the facilities available to the juvenile court, testimony of experts that the minor can be treated by those facilities is entitled to great weight in the court's ultimate determination. Moreover, if the court otherwise decided that the [juvenile court] program was best suited to the needs of the minor, it could hold him unfit if those experts testified that rehabilitation might require treatment beyond the date of his mandatory discharge.'" (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1286-1287, quoting *Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714-715.) While the court must consider each of the criteria listed in section 707, the weight given to each criterion "'is within the court's discretion' . . . ." (*Kevin P., supra,* 57 Cal.App.5th at p. 186.)

Appellant contends the transfer order is not supported by substantial evidence because the prosecution did not introduce expert testimony regarding the programs available to him in the juvenile system, why they were unlikely to result in his rehabilitation, or why they would take longer more than three years to rehabilitate him. The record, however, includes substantial evidence supporting the finding that appellant was not amenable to timely rehabilitation.

Probation officers Matsuda and Barnett described both the programs appellant had participated in while in juvenile custody and those that would be available to him at the county's Secure Youth Training Facility. These included post-secondary education, mental health care, and cognitive behavioral health programs relating to aggression, peer influences, behavioral triggers and substance abuse. The court also heard testimony that, while in juvenile custody, appellant had graduated from

10

high school, participated in a dog training program and worked in both the laundry and the canteen. Finally, the trial court considered evidence of appellant's conduct while in adult custody, including evidence that he had been in several fights and possessed weapons.

The prosecution's expert witness, Dr. Carmichael, opined that it would be "very challenging" to rehabilitate appellant in the time remaining before expiration of juvenile court jurisdiction. He based this opinion on several factors, including the "risk factors" associated with appellant's family circumstances and history of abuse as well as his behavior while in juvenile and adult custody. Carmichael was concerned that appellant appeared to lack motivation to engage with services and improve. Because he believed appellant was "reliant on external forces to make significant decisions," Carmichael opined it was less likely that treatment would result in "sustained improvement." By the time of the 2023 hearing, appellant had been in adult custody for two years. During that time, he engaged in several fights, possessed weapons, made and consumed alcohol and received gang tattoos. Carmichael noted that appellant continued to associate with a gang and opined that the loss of those two years for treatment made it even less likely he could be rehabilitated before the juvenile court's jurisdiction expired.

Appellant contends the juvenile court did not properly apply the amenability criterion because it focused on his behavior while in adult custody. But appellant's behavior in custody was only one of the factors the juvenile court considered.

Section 707 does not require the juvenile court to focus exclusively on expert testimony regarding amenability to

11

rehabilitation. (*In re E.P., supra,* 89 Cal.App.5th at pp. 416-417.) Instead, the statute mandates that the juvenile court consider each of the enumerated criteria and that, in evaluating whether the minor can be rehabilitated, it "shall give weight to any relevant factor, including, but not limited to the minor's potential to grown and mature." (§ 707, subd. (a)(3)(B)(ii).)

The juvenile court's lengthy remarks demonstrate that it fully complied with the statute. It expressly addressed each of the statutory criteria. The juvenile court explained that evidence of appellant's behavior in adult custody was relevant to the determination of whether appellant was amenable to rehabilitation. "One predictor of future conduct is looking at the past. He did well five years ago in a certain facility," but he had "somewhat regressed" while in adult custody. Appellant's inability to abstain from fighting while the transfer motion was pending was one fact indicating to the juvenile court that appellant was unlikely to be rehabilitated. This reasoning is consistent with section 707 and was not error.

*Conclusion*

The trial court's order of October 5, 2023, transferring this matter to the superior court is affirmed.

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

We concur:

BALTODANO, J.

CODY, J.

12

Ferdinand D. Inumerable, Judge

Superior Court County of Ventura

_____

Claudia Y. Bautista, Public Defender, Thomas Hartnett, Snr. Deputy Public Defender, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.